[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On August 3, 1990, the plaintiffs were the owners of a parcel of land CT Page 7387 in Vernon on the southwesterly side of Grove Street (Route 30) at the intersection of Grove Street and Hartford Turnpike (Route 31). On that day, the Commissioner of Transportation (the defendant) acquired by condemnation, pursuant to the provisions of Conn. Gen. Stat. sec.13a-73(b), the entire parcel "together with all buildings and appurtenances." The parcel then contained about 0.25 of an acre, and on it then were a one-and-two story wood frame building, constructed about 1958 for use as a residence, and a two-car garage. During the 1960's, the ground floor of the residence was converted to commercial-purposes uses. When the defendant acquired the parcel, the ground floor was rented to a restaurant and two retail stores, and the second floor was rented for residential purposes.
By an appeal dated August 10, 1990, the plaintiffs appealed from an Assessment of Damages that the defendant had filed, assessing at $147,000 the damages that the plaintiffs sustained as a result of the condemnation of their land. In their appeal, the plaintiffs, who have received the $147,000, allege that that amount is inadequate compensation for the property taken. The appeal has been referred to me, as a state trial referee, for a hearing and judgment. In the course of the hearing, the court heard testimony, and received a report (Exhibit B), from the appraiser for the plaintiffs, and heard testimony, and received a report (Exhibit 1), from the appraiser for the defendant. No one else testified. The court had the benefit of viewing the premises and of a brief submitted by counsel for the plaintiffs on the question whether Conn. Gen. Stat. sec. 48-21 applies to the present proceeding, a question to be considered hereafter.
 I
The Grove Street frontage of the plaintiffs' parcel totals 117.28 feet; the Hartford Turnpike frontage totals 84.10 feet. The parcel is in a C-20 Commercial Zone, which allows retail stores and, by special exception, restaurants. The present uses, however, are nonconforming because, inter alia, (a) the parcel does not meet the minimum lot-size requirement (20,000 square feet), and (b) the building exceeds the maximum building-coverage limit (25%). Although those uses are nonconforming, they are permitted nonconforming uses, because they are either pre-existing nonconforming uses or are uses permitted by a special exception. A continuance of those uses is, in the opinion of the appraiser for the plaintiffs and the appraiser for the defendant, the highest and best use of the parcel, and the court concurs in that opinion.
Under the provisions of Article 1, Section 11 of the Connecticut Constitution, the owner of property taken by condemnation is entitled to "just compensation." "Just compensation will ordinarily be the market value of the property, where, as in this case, the property taken is the only property of its owner which is affected by the taking." State v. Suffield Thompsonville Bridge Co., 82 Conn. 460, 467, 74 A. 775 (1909). "The `fair market value' is the price that the trier reasonably thinks CT Page 7388 would result from fair negotiations between a willing seller and a willing buyer. The valuation should ordinarily be based on the `highest and best' use of the land." Lynch v. West Hartford, 167 Conn. 67, 73, 335 A.2d 42
(1974).
The appraiser for the plaintiffs and the appraiser for the defendant are of the opinion that the best method of determining the fair market value of the plaintiffs' property is the income-capitalization approach, and the court agrees. Under this approach, income from and expenses of a property are computed to determine the projected net operating income (NOI) from the property for a specified period of time (the "holding period"). The NOI is then capitalized at a rate that is comparable to the capitalization rate for investments of similar character, risk and return. This method recognizes that, in the words of the report of the appraiser for the plaintiffs, "The typical investor in a property such as the subject is most interested in its cash flow generating capabilities and bases his or her investment decisions on the actual and anticipated income to be derived."
The first step in this approach is to determine the net operating income of the plaintiffs' property. In 1989, the gross rentals were $18,660. In 1990, the gross rentals were $20,244. In 1990, the expenses (including management and vacancy allowances) were $8,138; the net operating income, therefore, was $12,106 for 1990. The appraiser for the defendant is of the opinion that the rentals charged in 1990 are "reasonable" rentals; he is of the further opinion that the fair market value of the plaintiffs' property is $147,000. The NOI ($12,106) of those "reasonable" rentals yields a return of 8.235% on that estimated fair market value of $147,000. Yet, in his report, the appraiser for the defendant notes that the interest rates on commercial loans range from 11% to 11.75% (Exhibit 1, p. 13).The appraiser for the plaintiffs assumes an interest rate of 11% on commercial loans ((Exhibit B, p. 14). If a prospective purchaser were able to pay all cash for the property he would be getting only 8.235% on his $147,000 investment when he could get 11% or more by lending on a commercial mortgage loan. On the other hand, if he were to finance part of the purchase price with the proceeds of a mortgage, he would be paying almost three percentage points (three hundred basis points) more in interest on the mortgage than he would be receiving on that portion of his investment financed by the mortgage.
One explanation for this anomaly lies in the short terms of the leases having the"reasonable" rentals. The tenants are month-to-month tenants; lower rent from those tenants are acceptable to the owner, because he does not make any commitment concerning future rentals or the future use of his property. He pays a premium in the amount of the difference between the short-term rental and the long-term rental, because he does not wish to make a long-term commitment. From the point of view of the tenant, the month-to-month tenancy means that the tenant is running a risk that he may be forced to vacate if, for example, the landlord wishes to rent the property to someone else or to sell the property to someone else. If the CT Page 7389 tenant is forced to vacate, he faces the loss of goodwill established at that location and some part of what he has invested in equipping his place of business. For that reason, he is unwilling to pay the same rent that he would be willing to pay if he had the security of a longer lease.
Examples of the rentals paid under long-term leases have been cited, as comparables, in the report of each appraiser. The appraiser for plaintiffs listed as his comparables (Exhibit B; Exhibit D annexed thereto) the rents for four stores located in the Northeast Shopping Center , which is on East Street, about three hundred feet east of the plaintiffs' property. Of those four comparables listed, one is for a term beginning in May, 1990, and the other is for a term beginning in February, 1990. The May, 1990, lease is for 3900 square feet for 10 years, at an annual rental of $40,000, or $10.256 per square foot. That lease provides that the lessee is to pay all taxes and maintenance. The February, 1990, lease is for 1794 square feet for five years, with an option for five years, at an annual rental of $22,875, or $12.75 per square foot. That lease provides that the lessee is to pay tax-escalation and maintenance.
The appraiser for the defendant cited his comparables (Exhibit 1, p. 11) in more general terms. He referred to "newer retail space on Talcottville Road in a more desirable area . . . at rates ranging from $10 per square foot on a modified gross basis with the landlord providing similar services as in the subject leases. Retail space in the Caldor mall is at $13 NNN." He also noted that leases in the 1216 Colonial Center shopping center, about one-half mile from the plaintiffs' property, have rental rates currently in the $10.25 NNN range with annual escalations of 6% to 7%; and that in that shopping center, which is "newer . . . and superior" to the plaintiffs' property, individual spaces, ranging from 1,000 square feet to 3,000 square feet , are leased for five-year terms.
After considering the testimony and reports of the appraisers, including the comparables; viewing the premises, making warranted adjustments for differences in locations, availability of parking, and other elements affecting the fair-market-rental value of the plaintiffs' premises, the court is of the opinion and finds that: a) there is a demand for rentals for commercial purposes in the area where the plaintiffs' property is located, b) the present month-to-month leases for the plaintiffs' property do not yield the greatest net operating income that the plaintiffs' property can reasonably be anticipated to yield; c) a reasonably prudent-and-informed prospective purchaser would reasonably anticipate that a greater net operating income can be realized from the plaintiffs' property than is currently being realized; d) a reasonably prudent-and-informed seller of the plaintiffs" property would reasonably anticipate that a greater net operating income can be realized from the plaintiffs' property than is currently being realized; d) a reasonably prudent-and-informed purchaser and a reasonably prudent-and-informed seller would reasonably anticipate that there is a demand for rentals for a minimum lease-term of five years and that the rentals realized from those leases will be greater than the rentals realized from the present CT Page 7390 short-term leases.
The court is also of the opinion and further finds that: e) for the 700 square feet occupied by the restaurant and also by one of the stores, the fair-market-rental value is $6,300 a year, or $9.00 per square foot, for a lease with a minimum term of five years, plus payment by the tenant of the tenant's pro rata share of any increase in taxes on, insurance premiums on, and charges for water-and-sewer service to, the property of which the leased premises are a part, over and above the taxes on, insurance premiums on, and charges for water-and-sewer service to, that property in 1990, f) for the 1,140 square feet occupied by the other store, the fair-market-rental value is $7,750 a year or, rounded, $6.80 per square foot, for a lease with a minimum term of five years, plus payment by the tenant of the tenant's pro rata share of any increase in taxes on, insurance premiums on, and charges for water-and-sewer service to, the property of which the leased premises are a part, over and above the taxes on, insurance premiums on, and charges for water-and-sewer service to, that property in 1990. (The court notes that there is a difference of 74 square feet in the estimates made by the appraisers concerning the square footage in this store. The court has adopted the estimate of the appraiser for the defendant after reviewing the reports of the appraisers with particular attention to the specificity of their descriptions of the leased premises); g) both a reasonably prudent-and-informed seller and a reasonably prudent-and-informed buyer would reasonably believe that the space occupied by the restaurant and the two stores can be leased on the terms specified in the preceding subsections e) and f) of this paragraph.
The rental of $6,300 per year for the restaurant and $6,300 per year for one store is an increase of $1,800 over the $4,500 annual rental paid for each of those rented premises in 1990, a total increase of $3,600. The rental of $7,750 per year for the other store is an increase of $2,206 over the $5,544 annual rental paid for the other store in 1990. The combined increases total $5,806. That increase, coupled with the obligation of the tenants to pay any increase in taxes, insurance premiums, and water-and-sewer service, increases the projected net operating income to $17,912. The court is of the opinion and finds that the net operating income of the plaintiffs' property, based on the fair-market- rental value of the plaintiffs' property , is $17,912.
 III
The second step in determining fair market value by the income capitalization approach is to capitalize the net operating income. To arrive at a capitalization rate, the appraiser for the plaintiffs estimated a 75% mortgage at 11% and a return of 12% on the remaining equity of 25%, yielding a capitalization rate of 11.25%. (Exhibit B, p. 14). The appraiser for the defendant estimated "the most likely rate [for a mortgage] for the subject to be 11.25% for a three-year fixed rate with a 30-year amortization and a 3-year bullet [sic] [balloon?]." (Exhibit 1, p. 13). CT Page 7391
For each of the following reasons the court is of the opinion and finds that the capitalization rate estimated by the appraiser for the plaintiffs is the accurate capitalization rate applicable in the present litigation: 1) the court finds the testimony of the appraiser for the plaintiffs on this issue to be both credible and persuasive; 2) the appraiser for the defendant, as previously noted, estimated that interest rates for commercial loans range between 11% and 11.75%. The area where the plaintiffs' property is located and the uses being made of the plaintiffs property are such that a reasonable prospective mortgagee would regard the risk of both default and loss as very low and would reasonably be of the opinion that, within interest-rate range estimated by the appraiser for the defendant, an 11% mortgage rate would be justified by that very low risk, 3) in his testimony, the appraiser for the defendant expressed the opinion that a prospective purchaser would want a 12% return on his investment, that rate being the same rate used by the appraiser for the plaintiffs in calculating the return on the equity of a prospective purchaser.
Multiplying the capitalization rate of 11.25% by the net operating income of $17,912 yields, rounded, $159,201. (8.888 x $17,912). The court is of the opinion and finds that the fair market value of the plaintiffs' property on the day of taking is $159,201, and that, as a result of the taking of the plaintiffs' property by the defendant, the plaintiffs have sustained damages in the amount of $159,201.
 IV
The amount of the reassessment of damages by the court exceeds the amount of the damages assessed by the defendant. Accordingly, the plaintiffs are, pursuant to the provisions of Conn. Gen. Stat. sec.13a-76, entitled to an award of reasonable appraisal fees. The court finds that the reasonable appraisal fees for the appraisal of the plaintiffs' property by the appraiser for the plaintiffs is $3,000 and awards the plaintiffs $3,000 for those fees.
Conn. Gen. Stat. sec. 13a-73(b) provides that the clerk of the superior court shall give notice of an Assessment of Damages to "each person having an interest of record" in the land. The Assessment of Damages in this case listed each of four persons as having an "unrecorded lease" interest in the land taken, and the clerk of the superior court gave notice of the Assessment of Damages to each of the four persons.
Conn. Gen. Stat. sec. 48-21 provides that in any proceeding brought under, inter alia, Conn. Gen. Stat. sec. 13a-73(b), notice shall be given to all persons "appearing of record" as holders of a mortgage, lien or "other encumbrance" on any real estate taken by eminent domain or condemnation. This section of the statute then sets up a procedure whereby the amount due to the mortgagee, lienor, or other encumbrancer from the damages awarded in the condemnation proceeding may be determined. CT Page 7392 The question presented by Conn. Gen. Stat. sec. 13a-73(b) and Conn. Gen. Stat. sec. 48-21, under the facts of this case, is whether the four persons listed in the Assessment of Damages as having an "unrecorded lease" are (a) "persons of record "within the meaning of that phrase in Conn. Gen. Stat. sec. 13a-73 (b) and (b) holders of "any lien or other encumbrance" within the meaning of that phrase in Conn. Gen. Stat. sec.48-21.
The purpose of Conn. Gen. Stat. sec. 48-21 is to protect the interests of an encumbrancer of land taken for public use. Palo v. Rogers,116 Conn. 601, 604, 165 A. 803 (1933). A lessee is an "encumbrancer" for purposes of that statute. "In approving the referee's conclusion that [lessee's] lease was of no value because the option to renew had not been exercised before the taking, the court was in error. Every right or interest in property which has a market value must be compensated for in condemnation proceedings." Canterbury Realty Co v. Ives, 153 Conn. 377,384, 216 A.2d 426 (1966). "Whether the lease, including the options to renew, has a value under all the circumstances disclosed and, if so, what that value is is a question of fact for determination under established procedures." Canterbury, at 385. See, also, Annot. 3 ALR 2d 286, 288 (right of lessee to compensation when property leased is taken during term of lease is "well established") and 17 ALR 4th 337 (measure and elements of lessees' compensation). These authorities are persuasive that the four persons listed in the Assessment of Damages as having an"unrecorded lease" are persons "having an interest of record" within the meaning of that phrase in Conn. Gen. Stat. sec. 13(a)-73(b), and that each is an "encumbrancer" within the meaning of that word in Conn. Gen. Stat. sec.48-21. Accordingly, pursuant to the provisions of Conn. Gen. Stat. sec.48-21, although the court will enter a judgment finding the amount due to the plaintiffs, that judgment will provide for payment of the amount to the Clerk of the Superior Court for the Judicial District of Tolland, to be held by said Clerk of Court subject to the further orders of the court.
 VII
In sum, the court finds that the plaintiffs have sustained, as a result of the defendant's taking the plaintiffs' property in Vernon, damages of $159,201, and, therefore, judgment may enter against the defendant in the amount of $159,201, less the deposit of $147,000 already paid, a deficiency of $12,201, with statutory interest, which the court finds is fair, just and reasonable, from the date of taking to the date of payment, on such deficiency, and costs, plus appraisal fees of $3,000, and judgment may further enter that the defendant pay the deficiency of $12,201, and the statutory interest, to the Clerk of the Superior Court for the Judicial District of Tolland, the total sum of the deficiency and the statutory interest to be held by said Clerk of Court subject to the further orders of the court.
Rubinow, State Trial Referee CT Page 7393